UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JOSE RODRIGUEZ-QUEZADA,

Petitioner,

v.

NATHANJAH BREITENBACH, *et al.*,

Respondents.

Case No. 3:23-cv-00130-MMD-CLB

ORDER

Petitioner Jose Rodriguez-Quezada filed a counseled First Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 15 ("Petition").) In 2019, a Nevada jury convicted him of second-degree murder with use of a deadly weapon. (ECF No. 25-23 at 2; ECF No. 25-40 at 3.) His Petition alleges (1) the trial court erred by giving the jury a coercive *Allen*[1] charge in violation of Due Process; (2) trial counsel provided ineffective assistance in violation of the Sixth Amendment; and (3) cumulative error denied him a fair trial. (ECF No. 15 at 4-23.) For the reasons explained below, the Court denies the Petition and grants a Certificate of Appealability for Ground 1.

## I.   BACKGROUND[2]

On the afternoon of October 3, 2017, Kevin Edwards was found dead in his hotel room at Hard Rock Casino ("Hard Rock") in South Lake Tahoe, Nevada. (ECF No. 25-9

---

[1]"An *Allen* charge, the original concept of which was approved by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 501-02 (1896), is 'a supplemental instruction given by the court to encourage a jury to reach a verdict after that jury has been unable to agree after some period of deliberation.'" *United States v. Evanston*, 651 F.3d 1080, 1082 (9th Cir. 2011) (quoting *United States v. Nickell*, 883 F.2d 824, 828 (9th Cir.1989)).

[2]The Court summarizes the relevant state court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings

at 23-29, 38-39.) Blood was present throughout the room, furniture was overturned, and bed sheets were scattered. (ECF No. 25-15 at 92-93, 113-14, 120-21, 123-25, 127, 130, 134, 137.) His wallet, identification, credit cards, clothing, and two torn five-dollar bills were on the floor. (*Id.* at 121, 125, 133-34, 222.)

Edwards was 5'11' and weighed about 115 pounds. (ECF No. 25-11 at 100.) He died from multiple sharp force injuries—nine severe enough to cause short term death— including 25 stab wounds, and five major incised wounds. (*Id.* at 176-78.) A toxicology report revealed Edwards was HIV positive and had consumed methamphetamine, amphetamine, marijuana, and alcohol. (*Id.* at 192-93.) According to a pathologist's testimony, violent behavior could result from 200 nanograms per milliliter of methamphetamine in the bloodstream, and Edwards had nearly 24 times that in his bloodstream at death, i.e., 4,800 nanograms per milliliter of methamphetamine. (*Id.*)

On November 20, 2017, Rodriguez-Quezada was arrested for sleeping on a sidewalk in Reno, Nevada. (ECF No. 25-14 at 97-100.) His DNA profile matched profiles found on items retrieved from Edwards's hotel room, including a pink condom (that tested negative for the presence of semen but had hair from Edwards and Rodriguez-Quezada), an earring, a cigarette butt, and a sock. (ECF No. 25-11 at 60, 63; ECF No. 25-12 at 122-138, 148-66; ECF No. 25-15 at 155-56, 197-200, 212-14, 240-43.)

Rodriguez-Quezada initially denied knowing Edwards or going to the Hard Rock, but eventually admitted Edwards approached him on the street, he told Edwards he was tired and wanted to sleep, and Edwards offered to let him sleep in his hotel room. (ECF No. 25-15 at 14-15, 20, 23-24, 76-77.) After detectives reminded Rodriguez-Quezada that Lake Tahoe casinos have camera surveillance inside and outside the casinos and told him they had DNA evidence, Rodrigez-Quezada admitted he and Edwards had a violent encounter inside Edwards's hotel room at the Hard Rock. (*Id.* at 33, 77-78.) Rodriguez-

regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

Quezada said Edwards screamed at him, told him to get out of the hotel room, got aggressive, and pushed him. (*Id.* at 25, 33, 79.) Rodriguez-Quezada said he was scared and shaking. (*Id.* at 26.) He said Edwards pulled a knife on him, he took the knife, and the next thing he recalled there was blood all over, he didn't know what happened, and he "lost" himself. (*Id.* at 26, 33-34.) He said he wasn't trying to kill Edwards. (*Id.* at 43-44.) Rodriguez-Quezada threw away the knife he used on Edwards. (*Id.* at 30, 34-35, 80.)

Rodriguez-Quezada was charged by indictment with open murder. (ECF No. 23-2 at 1.) A seven-day jury trial commenced on Monday June 12, 2019 and concluded on Friday June 21, 2019. (ECF No. 23-1 at 22-29.) The jury found Rodriguez-Quezada guilty of second-degree murder with the use of a deadly weapon, and he was sentenced to life plus 20 years with a minimum parole eligibility of 18 years. (ECF No. 25-23 at 2; ECF No. 25-40 at 3.) The Nevada Supreme Court affirmed the judgment on appeal. (ECF No. 26-12.) Rodriguez-Quezada filed a state petition for post-conviction relief, the court dismissed all but one claim, and after an evidentiary hearing on the remaining claim, dismissed the petition. (ECF Nos. 26-29 at 7-8; 26-35.) Rodriguez-Quezada did not appeal. On March 23, 2023, Rodriguez-Quezada filed a *pro se* federal habeas petition, and his appointed counsel filed the operative First-Amended Petition. (ECF No. 1-1 at 30; ECF No. 6; ECF No. 15.)

## II.    GOVERNING STANDARDS

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. at 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. at 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.

When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Harrington*, 562 U.S. at 102.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of

4

proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.   DISCUSSION

### A.  New Evidence

Rodriguez-Quezada offers new evidence supporting factual allegations that were not presented to the state courts. For Ground 1 (i.e., alleging the trial court administered a coercive *Allen* charge), the evidence consists of a declaration of juror Sandy Garcia (ECF No. 16-2). For Ground 2(A) (i.e., alleging counsel was ineffective for failing to advise Rodriguez-Quezada to testify at trial), the evidence consists of notes from an interview between Rodriguez-Quezada and Dr. Martha B. Mahaffey (ECF No. 18-5). For Ground 2(B) (i.e., alleging counsel was ineffective for failing to present evidence that Rodriguez-Quezada suffered a broken rib), the evidence consists of jail medical records (ECF No. 18-2). Respondents contend the Court may not consider the factual bases set forth in that new evidence because Rodriguez-Quezada failed to develop them in state court, and he cannot meet the requirements for the Court's consideration of new evidence set forth in 28 U.S.C. § 2244(e)(2). (ECF No. 40 at 8-9, 13-19.)

Generally, the merits of claims raised in a federal habeas corpus petition are decided on the record that was before the state court when it adjudicated the claims. *See Cullen*, 563 U.S. at 180-81. AEDPA restricts a federal habeas court's authorization to hold an evidentiary hearing (or consider new evidence) where an applicant failed to develop a factual basis for a claim in state court proceedings:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A) the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been

previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B); *McLaughlin v. Oliver*, 95 F.4th 1239, 1248-49 (9th Cir. 2024) (acknowledging the Supreme Court reaffirmed § 2254(e)(2)'s restrictions not only apply to evidentiary hearings, but also "when a prisoner seeks relief based on new evidence *without* an evidentiary hearing") (citing *Shinn v. Ramirez*, 596 U.S. 366, 389 (2022) and quoting *Holland v. Jackson*, 542 U.S. 649, 653 (2004)).

To determine whether a petitioner must meet the prerequisites of § 2254(e)(2), the term "fail" means "the prisoner must be 'at fault' for the undeveloped record in state court." *Shinn*, 596 U.S. at 383. "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432, 434. "Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, *in light of the information available at the time*, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435 (emphasis added). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

In *Shinn*, the Supreme Court determined, because there is no constitutional right to counsel in state post-conviction proceedings, a prisoner is at fault for failing to develop the factual basis of a claim in state-court proceedings for purposes of § 2254(e)(2), even if the failure resulted from the negligence of post-conviction counsel. *See* 596 U.S. at 371, 382-83. Relying on *Shinn*, the Ninth Circuit held in *McLaughlin*, that the negligence of McLaughlin's first post-conviction counsel in failing to develop the record in state court was attributable to McLaughlin, was a "fail[ure]" within the meaning of § 2254(e)(2), and

therefore the restrictions of that section applied to him. *See id.* The Circuit held it could not consider McLaughlin's new evidence or the augmented version of his trial-ineffective-assistance claim based on that evidence. *See id.* (quoting *Shinn*, 596 U.S. at 375-76).

Rodriguez-Quezada contends he did not fail to develop the record because he requested an evidentiary hearing in his *pro se* state petition and his post-conviction review (PCR) counsel "abandoned him and provided no assistance" by missing deadlines, failing to appear at hearings, failing to respond to the state court's attempts to contact her, and failing to correctly advise him regarding appeal from the denial of the state petition. (ECF No. 49 at 17, 28-32.) Assuming for the sake of argument that attorney abandonment could provide grounds for avoiding the requirements of 28 U.S.C. § 2254(e)(2), the argument fails because the state court record shows his PCR counsel, while arguably negligent at times, did not abandon Rodriguez-Quezada.

"Abandonment occurs when counsel fails to 'operat[e] as [petitioner's] agent in any meaningful sense of that word.'" *Lee v. Thornell*, 118 F.4th 969, 982 (9th Cir. 2024) (citing *Maples v. Thomas*, 565 U.S. 266, 287 (2012) (first alteration in original) (quoting *Holland v. Fla.*, 560 U.S. 631, 659 (2010) (Alito, J., concurring in part and concurring in judgment)). "Abandonment can be evidenced by counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years, or by counsel's decision to withdraw from the case without notifying the petitioner or securing suitable replacement counsel." *Id.* (internal citations and quotation marks omitted). By contrast, a petitioner bears the risk of his attorney's "negligent conduct." *See Maples*, 565 U.S. at 281 (citing *Coleman v. Thompson*, 501 U.S. 722, 753-74 (1991)); *see also Lee*, 118 F.4th at 982 ("an attorney's 'negligent conduct' does not constitute abandonment.").

Rodriguez-Quezada filed a *pro se* state post-conviction petition on February 22, 2022, and requested appointment of counsel and an evidentiary hearing. (ECF No. 26-17 at 31.) PCR counsel was appointed on March 29, 2022. (ECF No. 26-20.) On April 5,

2022, PCR counsel was given 30 days to file and serve a supplemental petition and perfect service of the *pro se* petition on the State. (ECF No. 26-21 at 3.) On April 25, 2022, an amended notice of assignment of counsel indicated "the notice and file documents for this matter were not sent and did not reach" PCR counsel until April 6, 2022. (ECF No. 26-22 at 2.) PCR counsel did not file a supplemental petition or serve the *pro se* petition by the deadline. On September 26, 2022, the state court directed PCR counsel to appear in court on October 11, 2022, to show cause why counsel should not be held in contempt for failing to serve the *pro se* petition. (ECF No. 26-23 at 2-3.) PCR counsel appeared as required. (ECF No. 26-24 at 3.) The state court indicated court staff tried to contact PCR counsel and left messages that "we need to have something done," but "still nothing has been done." (*Id.*) PCR counsel apologized explaining she "could not get the documents." (*Id.* at 3-4.) The court gave counsel until 5:00 pm that day to serve the *pro se* petition, and counsel complied with the deadline. (ECF No. 26-24 at 4-5; ECF No. 26-25 at 2.)

On October 19, 2022, the State filed a motion to dismiss the state petition. (ECF No. 26-26.) On December 19, 2022, the state court ordered Rodriguez-Quezada to appear for a hearing on January 30, 2023. (ECF Nos. 26-27, 26-28.) Before the hearing, the state court dismissed all but one ground of the *pro se* petition. (ECF No. 26-29 at 7-8.) PCR counsel did not appear at the scheduled time for the hearing on January 30, 2023. (ECF No. 26-31 at 3-4.) The state court determined PCR counsel was in Reno and ordered counsel to return to the court immediately. (*Id.*) The hearing commenced upon counsel's arrival. (*Id.* at 5.) Counsel stated she misunderstood the court's ruling and thought she was no longer on the case. (*Id.*) The court noted counsel "consistently ignored" her professional obligations to the court in the case and "negligently" failed to respond to the court's calls. (*Id.* at 6, 9.) The court told counsel the remaining claim "has to do with your client's relationship with [trial counsel] on a particular issue." (*Id.* at 10.) PCR counsel confirmed trial counsel was available on February 8, 2023, and the matter

8

was continued to that date. (*Id.* at 12-13.) PCR counsel was ordered to pay $380 to avoid an order holding her in contempt of court, and counsel paid the fee. (ECF No. 26-31 at 14; ECF No. 26-33.)

PCR counsel appeared at the evidentiary hearing and conducted examination of trial counsel and Rodriguez-Quezada and cross-examination of the State's witness for Rodriguez-Quezada's claim that trial counsel failed to impart a guilty plea offer from the State. (ECF No. 26-32.) Rodriguez-Quezada cites a letter that PCR counsel sent to him as evidence that PCR counsel failed to timely and properly advise him regarding an appeal from the denial of the state petition. (ECF No. 49 at 31-32.)

Based on the state court record, PCR counsel was arguably negligent; however, Rodriguez-Quezada failed to establish his counsel abandoned him. Under *Shinn* and *McLaughlin*, the Court finds there is no evidence PCR counsel diligently attempted to develop in the state court proceedings the factual bases found in the juror's declaration, the interview notes of Dr. Mahaffey, or Rodriguez-Quezada's jail medical records. The negligence of PCR counsel is attributable to Rodriguez-Quezada, and he has not satisfied one of 28 U.S.C. § 2254(e)(2)'s narrow exceptions. *See Shinn*, 596 U.S. at 371, 384. Thus, in accordance with *Shinn* and *McLaughlin*, the Court finds Rodriguez-Quezada failed to establish the factual bases of his claims as set forth in the new evidence. Accordingly, the Court must conduct its analyses based on the same record that was before the state courts and will not consider Rodriguez-Quezada's new evidence.

### B. Ground 1—*Allen* Charge

Rodriguez-Quezada alleges the trial court violated his right to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments by giving an "*Allen* charge" in response to the jurors' announcement they were deadlocked. (ECF No. 15 at 4-13.) He claims (A) the charge inaccurately stated the law; (B) the charge coerced the jury under the circumstances; and (C) the charge coerced the hold-out jurors to capitulate to a

compromise verdict.[3] (*Id.*) Respondents contend the *Allen* charge accurately stated the law, and it was not objectively unreasonable for the state court to determine it was not coercive. (ECF No. 40 at 9-13.) Respondents allege Ground 1(C) is unexhausted and lacks merit. (*Id.* at 13-15.)

### 1. Standards for Evaluating an *Allen* Charge

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). The use of an *Allen* charge to encourage a deadlocked jury to reach a verdict "has long been sanctioned." *Id.* at 237 (citing *Allen*, 164 U.S. at 492). Review of a contention that a jury was improperly coerced requires consideration of the *Allen* charge given by the trial court "in its context and under all the circumstances." *See id.* (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)).

Unlike authority governing federal criminal trials in the Ninth Circuit,[4] the clearly established federal law, as determined by the Supreme Court, that governs unconstitutionally coercive jury instructions, is sparse and provides only general standards and guidance. *See, e.g.*, *Wong v. Smith*, 562 U.S. 1021, 1023 (2010) (Alito, J., dissenting from denial of certiorari).

In *Allen*, the Supreme Court held the following instruction was not coercive:

---

[3]For clarity, the Court subdivides the claims contained in Grounds 1 and 2 of the Petition.

[4]The Ninth Circuit recently explained it has held an *Allen* charge is improperly coercive "where it's clear from the record that the charge had an impermissibly coercive effect on the jury." *United States v. Chapman*, No. 24-4939, 2026 WL 1262809, at *9 (9th Cir. May 8, 2026). "To determine whether a charge given to a jury is coercive, we examine the 'totality of the circumstances,' including: (1) 'the form of the instruction'; (2) 'the time the jury deliberated after receiving the charge in relation to the total time of deliberation'; and (3) 'any other indicia of coerciveness.'" *Id.* Giving an *Allen* charge in a federal criminal trial while knowing the numerical breakdown of the jury's votes is "per se coercive and requires reversal." *See id.* And coercion is indicated where a short time frame for deliberation passes between an *Allen* charge and the delivery of the verdict. *See id.* (holding that coercion was supported where, after being deadlocked for two days, the jury deliberated for only 37 minutes after receiving the *Allen* charge before returning a unanimous guilty verdict.).

> [T]hat in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, [on] the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Allen*, 164 U.S. at 501.

In *Lias v. United States*, 284 U.S. 584 (1931), the Supreme Court cited *Allen* in summarily affirming the Fourth Circuit's holding that a supplemental instruction complied with *Allen*. There, jurors informed the trial court they had not agreed upon a verdict and were told they:

> [s]hould examine the questions submitted to them with proper regard and deference to the opinions of each other, and that, while undoubtedly the verdict of the jury should represent the opinion of each individual juror, a juror should ask himself whether he might not reasonably doubt the correctness of a conclusion not concurred in by the majority.

*Lias v. United States*, 51 F.2d 215, 218 (4th Cir. 1931).

In *Lowenfield*, a jury foreman deliberating on the penalty phase in a capital trial, sent the judge a note stating the jury was unable to reach a decision, and requested the court again advise the jury of its responsibilities. *See* 484 U.S. at 234. The jurors wrote responses to the question whether "further deliberations would be helpful in obtaining a verdict." *Id.* Eight believed further deliberation would be helpful and four did not. *See id.* The defense renewed a motion for mistrial arguing the jury was obviously hung. *See id.* The motion was denied, as that was the first sign the jury had trouble reaching a verdict. *See id.* The trial court instructed the jurors about their obligations to reach a verdict and directed them to resume deliberations. *See id.* After the jurors returned to the deliberation room, however, another note was sent to the court stating that some jurors misunderstood the question. *See id.* The judge again polled the jury, this time asking, "Do you feel that

any further deliberations will enable you to arrive at a verdict?" Eleven answered in the affirmative and one in the negative. *See id.* at 234. The court then reinstructed the jury:

> Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.
>
> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

*Id.* at 235. The jury resumed deliberations and, in 30 minutes, returned a verdict sentencing the defendant to death. *Id.* The Supreme Court found the combination of the polling of the jury and the supplemental instruction was not unconstitutionally coercive but limited its holding to the facts of the case, noting that "[b]y so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion." *Id.* at 241.

In *Early v. Packer*, 537 U.S. 3, 4 (2002), the Supreme Court, applying the AEDPA's deferential standard of review, reversed the Ninth Circuit's grant of habeas relief because the state court's decision that there was no jury coercion was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See id.* at 10-11. There, the jury returned sealed verdict forms on all the charges after 28 hours of deliberation, but one juror sent a note to the judge requesting dismissal from the jury. *See id.* The judge met alone with the complaining juror, and the juror explained that, due to the seriousness of the charges, they could not make snap decisions and were beginning to feel a little burned out. *See id.* When the juror agreed to "hold out just a little bit longer," the judge replied, "I really appreciate it. Otherwise, they have to start deliberations all over

again with another person." *Id*. The next day, the foreman notified the judge that the jury could no longer deliberate, the juror who asked for dismissal could not understand the instructions, and continuing deliberations would result in a hung jury based on that juror's inability to reason or a desire to be unreasonable. *See id.* The judge called the jury to the courtroom and read the note aloud. *See id.* at 4-5. The judge asked the foreman whether the jury was deliberating, and the foreman replied the jurors were "just having the same conversation over the same issue time and time again." *See id.* The judge made the following statement to the jury: "The juror has a right to do that, as you all know. They have a right to disagree with everybody else. But they do not have a right to not deliberate. They must deliberate and follow the rules and laws as I state it to them." *See id.* (internal quotation marks omitted). The judge asked the foreman for the vote count, without revealing which side had which number of votes, and the foreman indicated the last vote count was 11 to 1. *See id.* The foreman indicated further deliberations would be helpful and the judge instructed the jury:

> What you do is-like I think what the instructions were-you apply the facts to the law and you arrive at a decision. The law is right there, and I think elements of the law was [sic] given to you in those instructions. They do this or not do this? Was it proven beyond a reasonable doubt? This element, this element, this element? If they did and you find unanimously they did that, you must follow the law and find them either guilty or not guilty of that charge.

*Id*. (emphasis deleted). At that point, the defense objected that the judge was improperly "instructing the jury . . . as to their manner of deliberation." *Id*. The judge overruled the objection and continued his instruction as follows:

> Ladies and Gentlemen, the only thing I'm going to tell you right now is; once again, I told you, you'll look up in the instructions paraphrasing it, I think I'm using the correct words: you're the sole judges of the facts. You determine the facts. You then apply the law to those facts as I state it to you, and you must accept and follow the law. You can't make up your own law. You must accept and follow the law as I state it to you.

*Id*. at 5-6. The jury was then excused for the day. *Id*. After a day off, deliberations resumed, and the complaining juror again sent the judge a note asking to be dismissed

13

from the jury. *See id.* This time, the juror complained about feelings of distrust and disrespect from the other jurors and had reached a point of anger and didn't believe she could be objective. *See id.* The judge met alone with the juror, and the juror told the judge she was "trying" to deliberate but not to the satisfaction of the other jurors. *See id.* The juror returned to the jury room. *See id.* The judge then met with the foreman, who assured the judge that the juror was continuing to deliberate. *See id.* The jury then resumed deliberations. The following week, the jury returned a guilty verdict on one count and the next morning a guilty verdict on another count. *See id.* The Supreme Court ruled, "Even if we agreed with the Ninth Circuit majority (Judge Silverman dissented) that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." *Id.*

### 2. Additional Background

During Rodriguez-Quezada's trial, the trial court informed the jurors they would not be required to attend court on Saturday or Sunday. (ECF No. 25-11 at 15.) The trial court later informed the jurors they would not be allowed to leave once they retired to deliberate:

> And just so that there's no confusion as we move along, you know, as you've already experienced, during the evening you're certainly free to go, and at lunch, and on the breaks you're free to go, but you need to know that once you retire to deliberate, you won't be leaving until you ultimately reach a verdict. And so I don't know what day that will come about, and I don't know what hour of the day that might be. It might be early in the day, and it might be later, whatever.

> But I once had some jurors a little confused they didn't get to break their deliberations and go home at 5:00. And that's simply not how it works. On the day that you do retire to deliberate, whenever that is, you should anticipate that you'll remain with us, and you'll be back in the jury room, absent my order to go somewhere else, until such time as there is a verdict, okay? I just want to give you a heads-up on that now so that you may plan appropriately. Thank you.

(ECF No. 25-12 at 98-99.) The trial court subsequently reminded the jury that, once they retired to deliberate, they would be there until they were done deliberating. (ECF No. 25-17 at 45.)

After the closure of evidence, the jury was given Jury Instruction No. 45:

14

It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. However, you should not be influenced to vote in any way on any question submitted to you by the single fact that a majority of the jurors, or any of them, favor such a decision. In other words, you should not surrender your honest convictions concerning the effect or weight of evidence for the mere purpose of returning a verdict or solely because of the opinion of the jurors. Whatever your verdict is, it must be the product of a careful and impartial consideration of all the evidence in the case under the rules of law as given you by the court.

(ECF No. 25-18 at 46.)

After closing remarks on a Friday, the trial court informed the jury, "I'll send you back for your deliberation. I realize it's a quarter until 5:00. If we get too late . . . We'll provide you a meal, but we'll have you go back . . . we will be in recess until the call of the jury," and the jury was excused to the jury room for deliberations. (ECF No. 25-22 at 151.)

Approximately five hours later, the trial court informed the parties it "just received a note that reads we are a hung jury, not guilty, three not guilty. There is no hope of agreement. Does this mean not guilty automatically?" (*Id.* at 153.) The trial court informed the parties that it did not intend to answer the jury's question. (*Id.*) The court stated it did not "want to be coercive toward those individuals who are on either side of the fence that might lead them to feel like they have to change their personally and apparently deeply held convictions regarding this trial." (*Id.*) The court asked the parties to address whether the court should give an "*Allen* charge" as approved by the Nevada Supreme Court in *Wilkins v. State*, 609 P.2d 309, 312 (1980). (*Id.* at 153-54.)

The State argued, "It would be inaccurate to answer the question the way it's been asked," and an *Allen* charge was appropriate. (*Id.*) The State further argued it was late at night and queried whether there was a reason to have them continue to deliberate that night. (*Id.*) The trial court asked, "Do we bring them back tomorrow morning? Do we wait until Monday morning?" (*Id.*) The State argued it was unknown whether the jurors could come back Saturday. (*Id.*) The trial court expressed concern "about giving them an *Allen*

15

charge and sending them home." (*Id.*) The State suggested, "We can give them an *Allen* charge and give them an hour . . .." (*Id.* at 154-55.) The court agreed it was "pretty late" and reminded the parties that the jury said, "They believe there's no hope of a verdict." (*Id.*)

The defense argued "there is no good answer" to the jury's question and the court should respond by referring the jury to the pre-deliberation step (i.e., transition) instructions, which laid out the path for determining the jury's verdict, beginning with whether the jury could agree on acquittal. (*Id.* at 155, 163-64.) The defense objected to the *Allen* charge because it was late, the jury's note firmly stated there was no hope of reaching an agreement, and the court already gave them Jury Instruction No. 45. (*Id.*) The defense argued the *Allen* charge was disfavored and inappropriate because the jury did not indicate any potential for possible continued deliberation and, instead, firmly stated there was no hope of agreement. (*Id.* at 156.)

The trial court mentioned it had one concern about the *Allen/Wilkins* instruction:

> You know, quite frankly, and I'm not supposed to be in the business of disagreeing with the Nevada Supreme Court but it seems to me that one of the problems with this instruction that's in *Wilkins* is the last sentence that says your sole interest is to ascertain the truth of the evidence of the case. And—and all of the other instructions in a criminal case make it clear that the jury's real sole interest is to ascertain whether the State has met its burden, whether it has proven its case beyond a reasonable doubt, and I don't know if that is the same as ascertaining the truth, and that may be an inherent flaw or an inherent beauty of this system of justice, but I don't know that this statement is correct.

(*Id.* at 156-57.)

The State argued the *Allen* charge approved in *Wilkins* should be given, but conceded the defense was correct that the Nevada Supreme Court indicated in *Wilkins* that an *Allen* charge was "generally disfavored" and had reluctantly approved the *Allen* charge and gave conditions in which it could be issued. (*Id.* at 157-58.) The trial court stated, "I really don't want to give an *Allen* charge and send them home." (*Id.*)

The defense moved for mistrial based on the jury's note. (*Id.* at 159.) The trial court denied it, explaining the jury note in *Wilkins* was categorically different than the one here.

16

(*Id.*) The court indicated it would give the jury the *Allen* charge approved in *Wilkins*, and the defense asked that the court "not give them a time frame." (*Id.* at 159-60.) The court agreed. (*Id.*) The defense asked the court to instead refer the jury to Instruction No. 45, but the court declined, resolving to give the instruction as required by *Wilkins*. (*Id.*) The jury was called to the courtroom and given the following instructions:

> Good evening. And I, first of all, I know that it's late and I appreciate that. I know that it's late and I certainly do appreciate that fact. And circumstances such as this, I have your note, the Nevada Supreme Court gives me some direction on what I am supposed to do and that is that I'm supposed to read you something and give you an additional instruction which I have Ms. Wagstaff just presented which I'm going to provide you.
>
> Ladies and gentlemen, the verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with the view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You're not partisans. You are judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case.
>
> Now, that's the instruction. With that in mind I'm going to ask you to go back and consider where you are I'll give this to you in writing so that you may read it again. I am respectful of the fact that it is late, and we will await hearing from you.

(*Id.* at 160-62.) After the jury left to continue its deliberations, the trial court informed the parties that it did not plan to keep the jury past 11:00 p.m., and if the jury came back and told the court, "It's a hopeless deadlock," then the court was inclined to grant a mistrial. (*Id.*)

After 11:00 p.m., the trial court informed the parties that it intended to ask the jury to come back to ask whether they believed they were still hopelessly deadlocked and to determine where to go from there. (*Id.* at 163.) The defense suggested the trial court send a note to the jury asking whether it believed further deliberations would be fruitful, and the

State agreed with that approach; however, before that note was sent to the jury, the jury returned to the courtroom with a verdict. (*Id.* at 166-73.)

### 3. The State Court Determination

The Supreme Court of Nevada, in applying *Allen* and *Lowenfield*, considered the full context and circumstances surrounding the *Allen* charge and ruled (1) the charge was an appropriate response to the jury's note and did not coerce the verdict, and (2) applying plain error review, the instruction was a correct statement of the law:

> [R]odriguez-Quezada argues that the district court erred in instructing the jury after receiving a note indicating it was deadlocked and in denying his related motion for a mistrial. A court may instruct the jury after it indicates deadlock so long as the instruction "clearly informs the jury that each member has a duty to adhere conscientiously to his or her own honest opinion, and if it avoids creating the impression that there is anything improper, questionable or contrary to good conscience for a juror to create a mistrial." *Wilkins v. State*, 96 Nev. 367, 373, 609 P.2d 309, 312 (1980); *see also Allen v. United States*, 164 U.S. 492 (1896). We consider the full context and circumstances surrounding such an instruction when reviewing a claim that it improperly coerced a jury's verdict. *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988).

> Rodriguez-Quezada argues that the district court erred in giving a *Wilkins* instruction because the jury indicated it had "no hope" of agreeing on a verdict. We disagree. It was the first day of deliberations and the jury had been deliberating a short time relative to the case's complexity. *See Farmer v. State*, 95 Nev. 849, 854-55, 603 P.2d 700, 703-04 (1979) (explaining that to discharge a jury before verdict, a district court must be satisfied that there is no reasonable probability of agreement); *see also Arizona v. Washington*, 434 U.S. 497, 509 (1978) (indicating that a trial court should discharge a jury only after determining it is "genuinely deadlocked").

> Rodriguez-Quezada also argues that the instruction was coercive. We again disagree. That the instruction was given late at night and a guilty verdict came approximately an hour and a half later does not alone indicate coercion.

>> [FN 2] And Rodriguez-Quezada fails to support his argument that the district court gave jurors the impression that they could not leave the courthouse until reaching a verdict with record citations. *See* NRAP 28(a)(10)(A) (requiring appellant's brief to contain "citations to the authorities and parts of the record on which the appellant relies").

> *See* NRS 175.461 (providing that the length of time a jury may be kept for deliberation is within the trial judge's discretion); *Boonsong Jitnan v. Oliver*, 127 Nev. 424, 431 n.1, 254 P.3d 623, 628 n.1 (2011) (rejecting appellant's contention that the district court coerced a prompt verdict by requiring the jury to begin deliberating around 9:00 p.m. after a day of trial); *see also*

18

*Lowenfield*, 484 U.S. at 237-41 (finding no judicial coercion where a deliberating jury's note suggested deadlock, the court instructed the jury to keep deliberating with an open mind, and the jury returned a verdict thirty minutes later); *United States v. Graham*, 758 F.2d 879, 885 (3d Cir. 1985) ("While some courts have found the length of time the jury was made to deliberate, to be coercive, [those] cases have involved affirmative coercive conduct of the district court, such as reminding the jury that the weekend was approaching or creating the impression that the jury would be locked up all night." (internal citations omitted)). Indeed, Rodriguez-Quezada did not initially object to the jury deliberating during nighttime hours, specifically asked the court not to give the jury a time frame for its continued deliberations, and indicated his preference that the jurors continue deliberating while the evidence was fresh in their minds. Further, the court neither demanded that the jury return a verdict nor expressed a preference for a specific verdict; rather, the court asked the jury to go back and consider "where [they were]" given the additional instruction. *Cf. Redeford v. State*, 93 Nev. 649, 651-53, 572 P.2d 219, 220-21 (1977) (concluding that the trial court erred in giving an instruction that effectively demanded that the jury return a verdict).

Rodriguez-Quezada finally takes issue with the language in the instruction. He argues that the district court incorrectly instructed the jurors regarding their duty to apply the law to the facts by stating they were "judges of facts" and that their "sole interest is to ascertain the truth from the evidence." And, he contends the instruction should have informed the jurors that they could disagree. But he did not make these, or any language-specific, arguments below. Where an appellant has not objected to the adequacy of a jury instruction below, we review for plain error affecting substantial rights. *Ramirez v. State*, 126 Nev. 203, 208, 235 P.3d 619, 623 (2010). Here, the district court used the instruction approved in *Wilkins*. 96 Nev. at 373 & n.2, 609 P.2d at 313 & n.2. The district court did not plainly err by using that instruction. *See Staude v. State*, 112 Nev. 1, 6, 908 P.2d 1373, 1377 (1996) (concluding that the district court "erred in not using the instruction approved in *Wilkins*").

For these reasons, the district court did not abuse its discretion in denying Rodriguez-Quezada's motion for a mistrial and issuing a *Wilkins* instruction. *See Ledbetter v. State*, 122 Nev. 252, 264, 129 P.3d 671, 680 (2006).

*Rodriguez-Quezada v. State*, 484 P.3d 276 (2021).

### 4. Analysis of Ground 1

#### a. Ground 1(A)

Rodriguez-Quezada contends the *Allen/Wilkins* charge given to the jury was an incorrect statement of law. (ECF No. 15 at 6-8.)

Issues relating to the content of jury instructions are not cognizable in federal habeas corpus unless the instruction "so infected the entire trial that the resulting

conviction violates due process." *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]'" *Id.* (quoting, in part, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting, in part, *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). It is presumed that juries follow instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Thus, "[t]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde v. Cal.*, 494 U.S. 370, 380 (1990). A reviewing court does not engage in technical parsing of the instruction's language; rather, it approaches the instructions in the way the jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *See Johnson v. Tex.*, 509 U.S. 350, 368 (1993).

The *Allen/Wilkins* charge given to Rodriguez-Quezada's jury was approved by the Nevada Supreme Court. *See Wilkins*, 609 P.2d at 373 & n.2. The Nevada Supreme Court in *Wilkins* did not write its own instruction; instead, it expressly approved "the American Bar Association's version of the *Allen* charge . . .," set it out in the court's opinion for future guidance and noted that "a great number of jurisdictions" had recently approved the instruction. *See id.* The language of the *Allen/Wilkins* instruction is like the instructions previously approved by the Supreme Court in *Allen*, *Lias*, and *Lowenfield*. And the *Allen/Wilkins* instruction echoed the pre-deliberation instructions. For instance, Jury Instruction No. 45 included language identical to the language given in the *Allen/Wilkins* charge, e.g., "It is your duty as jurors to consult with one another and to deliberate with the view to reaching an agreement if you can do so without violence to individual judgment," "you must decide the case for yourself," and "do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your

fellow jurors or for the mere purpose of returning a verdict." (ECF No. 25-18 at 46; ECF No. 25-22 at 160-62.) The *Allen/Wilkins* charge echoed pre-deliberation instructions that the jury's verdict—whether for guilt or acquittal—must be unanimous. (ECF No. 25-18 at 39-41; ECF No. 25-22 at 161.)

Rodriguez-Quezada argues the *Allen/Wilkins* charge should have reinstructed the jury about the burden of proof and the instruction conflicts with instructions regarding the burden of proof because it states, "Your sole interest is to ascertain the truth from the evidence in the case." (ECF No. 15 at 6.) He points to the trial court's concerns about that sentence in the *Allen/Wilkins* charge. (*Id.*) Rodriguez-Quezada cites no clearly established federal law requiring, when giving an *Allen* charge, a reinstruction on the State's burden of proof. The ABA model charge, adopted by the Nevada Supreme Court in *Wilkins*, did not include a reinstruction on the principles of the burden of proof. *See Salemme v. Ristaino*, 587 F.2d 81, 89 (1st Cir. 1978) ("The model charge recommended by the ABA does not include a reinstruction on the principles of burden of proof."). Although the trial court expressed concern about the language, it also noted "all the other instructions in a criminal case make it clear that the jury's real sole interest is to ascertain whether the State has met its burden, whether it has proven its case beyond a reasonable doubt . . .." (ECF No. 25-22 at 156-57.) That is precisely the case here. Only hours before the *Allen/Wilkins* charge, the jury was exposed to extensive instructions on the burden of proof, and the parties additionally gave repeated reminders about the burden of proof during closing argument. (ECF No. 25-18 at 7, 15, 23, 25, 30, 31, 33, 41; ECF No. 25-22 at 81-82, 85, 92-93, 99, 119, 127); *see also*, *e.g.*, *Salemme*, 587 F.2d at 89 (holding that, in a pre-AEDPA case, the trial court's failure to reinstruct the jury on the burden of proof was not constitutionally defective because "extensive instructions had been previously given"). Rodriguez-Quezada argues the First and Tenth Circuits have held an *Allen* charge must remind jurors of the prosecutor's burden of proof. (ECF No. 15 at 7.) Circuit precedent does not constitute "clearly established Federal law, as determined by the

21

Supreme Court" under 28 U.S.C. § 2254(d)(1). *See Parker v. Matthews*, 567 U.S. 37, 48-49 (2012). Therefore, it "cannot form the basis for habeas relief under AEDPA." *Id.*

Rodriguez-Quezada argues the *Allen/Wilkins* charge incorrectly instructed the jurors they were the "judges of facts" because "it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence." (ECF No. 15 at 7-8). It is a jury's constitutional responsibility to determine facts and apply the law to facts and draw conclusions of guilt or innocence. *See United States v. Gaudin*, 515 U.S. 506, 514-15 (1995). Here, the jury was instructed pre-deliberation that there were two classes of questions for determination: questions of law and questions of fact. (ECF No. 25-18 at 2, 8.) The instructions explained it was the judge's "duty to instruct" them "in the law that applies to this case," it was the jurors' duty "to follow the law," and it was "the exclusive province of the jury to determine the facts in the case by considering and weighing all of the evidence presented." (*Id.*) And the jury was instructed it was the jury's task to determine what evidence was true and then apply the law to those true facts to determine whether Rodriguez-Quezada was guilty of a crime. (*Id.* at 8, 14.)

The Nevada Supreme Court's determination that the *Allen/Wilkins* charge was a correct statement of law is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Accordingly, Rodriguez-Quezada is not entitled to habeas relief for his claim under Ground 1(A).

### b. Ground 1(B)

Rodriguez-Quezada alleges the *Allen/Wilkins* charge coerced the jury's verdict for second-degree murder because the jurors were kept late, were given an impression they could not leave the courthouse until they reached a verdict, the jury deliberated for a short time after receiving the instruction, and the instruction coerced the hold-out jurors by

22

implicitly communicating a deadlocked jury was unacceptable. (ECF No. 15 at 8-11.) The Court finds that the Nevada Supreme Court's determination (i.e., that, based on the context and circumstances, the *Allen/Wilkins* charge was not coercive) to be objectively reasonable.

Rodriguez-Quezada contends the *Allen/Wilkins* charge coerced the verdict because, in response to the jury's note that they were deadlocked, the instruction did not inform the jurors they had a right to disagree; rather, it coerced the three hold-out jurors to capitulate to the majority's view and change their verdict because the instruction informed them their verdict must be unanimous, thereby leading the holdouts to believe they must relinquish their opinions and come to an agreement with the other jurors. (ECF No. 15 at 9-13.) As explained above, the *Allen/Wilkins* instruction did not differ from the pre-deliberation instructions, which informed the jury that a verdict of either not guilty or guilty must be unanimous. (ECF No. 25-18 at 39-40, 47.) Moreover, the *Allen/Wilkins* charge, like the language in pre-deliberation Instruction No. 45, did not eliminate the possibility the jury would not unanimously agree on a verdict because it left room for disagreement by instructing, "It is your duty as jurors to consult with one another and to deliberate with the view to reaching an agreement *if you can do so without violence to individual judgment*," "[e]ach of you must decide the case for yourself," and "*do not surrender your honest conviction* as to the weight or effect of evidence solely because of the opinion of your fellow jurors or *for the mere purpose of returning a verdict*." (ECF No. 25-18 at 46; ECF No. 25-22 at 160-62) (emphasis added). Finally, as the Nevada Supreme Court pointed out, the trial court did not demand a verdict or express a desired outcome; rather, after giving the *Allen/Wilkins* charge, it merely asked the jury to go back to the jury room and consider "where [they were]."

Rodriguez-Quezada claims the jurors were coerced because they were kept in deliberation late on a Friday night. (ECF No. 15 at 10-11.) He argues the trial court coerced the verdict by failing to inquire as to whether future deliberation would be fruitful

and whether stopping deliberation and resuming later would be beneficial. (*Id.*) He claims the jurors were coerced to deliver the verdict because the trial court gave the jurors no guidance about how long they would be required to deliberate, did not tell them whether they would be required to deliberate over the weekend, and did not ask whether the deliberations imposed a hardship on the jurors. (*Id.* at 10-11.) The record, however, shows the jurors were told well in advance of deliberations—and more than once—that they were expected to deliberate until they delivered a decision but were not expected to deliberate on Saturday or Sunday. The jurors expressed no concern about these expectations and, based on the trial court's advanced warnings, they could reasonably conclude they would be kept no longer than midnight on Friday. Thus, it was reasonable for the Nevada Supreme Court to conclude there was no coercion on these bases. Moreover, the Nevada Supreme Court reasonably concluded that the jury's continued deliberations for approximately 30 minutes after receiving the Allen/Wilkins charge, rather than immediately returning a verdict, weighed against a finding that the late-night delivery of the charge coerced the verdict. *See, e.g., United States v. Freeman*, 498 F.3d 893, 908 (9th Cir. 2007) (finding timing not indicative of coercion where jury deliberated for approximately three hours before announcing its deadlock and for two hours following the *Allen* charge).

Rodriguez-Quezada further argues the instruction was coercive because the trial court did not answer the jury's question as to whether the vote count meant "automatic acquittal," leaving the jury to assume the deadlock meant automatic acquittal. (ECF No. 15 at 9-10.) This argument was not presented to the Nevada Supreme Court and thus was not addressed. (ECF Nos. 26-7, 26-11.) Although the argument may be subject to claims of exhaustion and procedural default, Respondents failed to raise those defenses in their motion to dismiss or answer. (ECF Nos. 29, 32, 40.) The Court concludes that, regardless of issues of exhaustion and procedural default, the argument lacks merit, even on *de novo* review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can .

. . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review . . ..”). Assuming the jury followed the instructions, the jury could not possibly misinterpret the trial court’s failure to respond to the question as an indication the deadlock meant Rodriguez-Quezada would be automatically acquitted. The transition instructions informed the jury about the steps for determining a verdict of not guilty and guilty. (ECF No. 25-18 at 39-41.) The instructions communicated that the jury’s verdict for acquittal must be unanimous, e.g., “You should first examine the evidence in this case to decide whether the killing was lawful or unlawful. If you unanimously agree that the killing was lawful and justified, you must sign the not guilty verdict form and then request that the bailiff return you to court.” (*Id.*) The jury received a copy of those instructions in the deliberation room. (ECF No. 25-22 at 16-17.) Moreover, Rodriguez-Quezada has cited no clearly established federal law as determined by the Supreme Court holding a trial court’s refusal to inform the jury of the consequences of deadlock in a non-capital case is required or that failure to do so constitutes coercion. *Cf. Jones v. United States*, 527 U.S. 373 (1999) (rejecting theory that, in federal capital case, a district court’s failure to instruct the jury as to the consequences of deadlock in the penalty phase gives rise to a violation of the Eighth Amendment prohibition of cruel and unusual punishment and refusing to exercise its supervisory powers to require that an instruction on the consequences of deadlock be given in every capital case).

The Nevada Supreme Court’s determination that the *Allen/Wilkins* charge did not coerce the jury’s verdict is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Early*, 537 U.S. at 11. Accordingly, Rodriguez-Quezada is not entitled to federal habeas relief on Ground 1(B).

### c.  Ground 1(C)

Rodriguez-Quezada argues that, based on factual allegations contained in a juror's affidavit, the *Allen/Wilkins* charge coerced the three hold-out jurors to capitulate to the majority's view and change their verdict. (ECF No. 15 at 12-13.) Respondents contend this claim should be dismissed as unexhausted. (ECF No. 40 at 13-14.) Rodriguez-Quezada argues the Respondents waived the exhaustion defense. (ECF No. 49 at 17.) The government may waive exhaustion, but it must do so expressly. *See* 28 U.S.C. § 2254(b)(3). Respondents did not expressly waive the exhaustion defense. Respondents argue the claim in Ground 1(C) is unexhausted because Rodriguez-Quezada did not allege in the state court proceeding that the *Allen/Wilkins* charge coerced the holdout jurors, and he relies on factual allegations contained in the juror affidavit that were not presented to the state court. (ECF No. 40 at 14.)

A petitioner must give the state courts a fair opportunity to act on each of his claims before he presents those claims in a federal habeas petition. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim remains unexhausted until the petitioner has given the highest available state court the opportunity to consider the claim through direct appeal or state collateral review proceedings. *See Casey v. Moore*, 386 F.3d 896, 916-18 (9th Cir. 2004); *Garrison v. McCarthy*, 653 F.2d 374, 376 (9th Cir. 1981). To achieve exhaustion, the state court must be "alerted to the fact that the prisoner[] [is] asserting claims under the United States Constitution" and given the opportunity to correct alleged violations of the prisoner's federal rights. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *see also Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). A claim is not exhausted unless the petitioner has presented to the state court the same operative facts and legal theory upon which his federal habeas claim is based. *See Bland v. Cal. Dep't of Corr.*, 20 F.3d 1469, 1473 (9th Cir. 1994) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).

A petitioner may reformulate his claims in a federal habeas petition so long as the substance of his argument made to the state courts remains the same. *See Picard v. Connor*, 404 U.S. 270, 277-78 (1971). New factual allegations that do not "fundamentally alter the legal claim already considered by the state courts" will not render a claim unexhausted. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (*en banc*) (explaining that "a claim has not been fairly presented in state court if new factual allegations either fundamentally alter the legal claim already considered by the state courts, or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it") (internal citations omitted).

In the state court, Rodriguez-Quezada argued the timing and issuance of the *Allen/Wilkins* charge was coercive and prejudicial because three jurors, who determined Rodriguez-Quezada was not guilty, later agreed to convict after receiving the instruction. (ECF No. 26-7 at 24-25.) Ground 1(C), unlike the claim presented to the state courts, relies on factual allegations contained in a juror affidavit. (ECF No. 15 at 12-13; ECF No. 16-2; ECF No. 26-7.) The new factual allegations based on the juror affidavit do not fundamentally alter the legal claim considered by the state court and do not place the claim in a significantly different or stronger evidentiary posture than it was in when the state courts considered it because, as already explained above, the Court may not consider the evidence presented in the juror affidavit (ECF No. 16-2). Thus, the claim is exhausted. Because the Court's determination of the claim in Ground 1(C) must be based on the evidence presented in the state court, and because there is no evidence the *Allen/Wilkins* instruction coerced the hold-out jurors to change their verdict, Ground 1(C) is denied.

### C. Ground 2

Rodriguez-Quezada claims he received ineffective assistance from trial counsel in violation of the Sixth Amendment because counsel failed to (A) advise Rodriguez-

Quezada to testify in his own defense; and (B) present evidence of Rodriguez-Quezada's rib fracture. (ECF No. 15 at 13-23.) Respondents contend these claims are procedurally defaulted. (ECF No. 40 at 6-7.) Rodriguez-Quezada agrees the claims are technically exhausted by procedural default and claims he can overcome the default under *Martinez*. (ECF No. 15 at 13; ECF No. 49 at 27-34.)

### 1. Standards for Evaluating Ineffective Assistance of Counsel

A petitioner claiming ineffective assistance of counsel ("IAC") has the burden of demonstrating (1) the attorney made errors so serious that he or she did not function as counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *See Williams*, 529 U.S. at 390-91 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish ineffectiveness, a petitioner must show counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. Review of the attorney's performance is "highly deferential" and adopts counsel's perspective at the time of the challenged conduct to avoid the distorting effects of hindsight. *See id.* at 689. A petitioner bears the burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *See id.* An attorney must make a reasonable investigation in preparation for trial or a reasonable decision not to investigate. *See Strickland*, 466 U.S. at 691. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. To establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.*

### 2. Standards for Evaluating Procedural Default of IAC Claims

The failure of post-conviction counsel to raise a claim in state post-conviction proceedings generally does not serve as cause to overcome a procedural default of an

unraised claim. *See Coleman,* 501 U.S. at 753. The Supreme Court in *Martinez* authorized a narrow exception to that rule by holding a federal habeas court can excuse a petitioner's default of an ineffective-assistance-of-trial-counsel claim where (1) the claim of ineffective assistance of trial counsel is a "substantial" claim; (2) the "cause" consists of there being no counsel or only ineffective counsel during the state-collateral-review proceeding; (3) the state-collateral-review proceeding was the "initial" review proceeding for the ineffective-assistance-of-trial-counsel claim; and (4) state law requires an ineffective-assistance-of-trial-counsel claim be raised in an initial review collateral proceeding. *See Trevino v. Thaler*, 569 U.S. 413, 423 (2013); *see also Martinez*, 566 U.S. at 14, 18.[5]

An IAC claim against trial counsel "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court stated the standard for issuing a Certificate of Appealability as analogous support for whether a claim is substantial. *See Martinez*, 566 U.S. at 14. Under that standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017 (9th Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a

---

[5]Nevada prisoners must raise IAC claims involving trial counsel in an initial state post-conviction petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

showing that the [trial counsel IAC] claim is 'substantial.'")). Review of trial counsel's actions under a *Martinez* prejudice analysis is conducted "under a more relaxed standard", while the *Strickland* standard is applied "with full force" when considering actions of post-conviction review counsel under a *Martinez* analysis. *See Leeds*, 75 F.4th at 1022. If a petitioner can show cause and prejudice to excuse a procedural default, a federal court may consider the claim *de novo*. *See Dickens*, 740 F.3d at 1302, 1321 (citing *Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002)). In *Shinn*, the Supreme Court held that when evaluating the merits of an ineffective-assistance-of-counsel claim whose default was excused under *Martinez*, a federal habeas court may not "order an evidentiary hearing or otherwise expand the state-court record" unless the petitioner can satisfy one of 28 U.S.C. § 2254(e)(2)'s narrow exceptions. *See Shinn*, 596 U.S. at 371, 384. Instead of conducting a strict *Martinez* analysis, a district court may alternatively determine that the ineffective-assistance claim fails on the merits under *Strickland. See Howard v. Baker*, No. 10-99003, 2023 WL 334011, at *1 & n.2 (9th Cir. Jan. 20, 2023) (citing *Runningeagle v. Ryan*, 825 F.3d 970, 982-83 (9th Cir. 2016)).

### 3. Ground 2(A)—Failure to Advise Petitioner to Testify at Trial

Rodriguez-Quezada alleges trial counsel provided ineffective assistance by failing to advise him to testify at trial in his own defense. (ECF No. 15 at 13-20.) Rodriguez-Quezada alleges he is a native Spanish speaker with a learning disability, never finished elementary school, and his responses to the interview played for the jury, in which detectives interviewed him without an interpreter, reflect his language barrier. (*Id.*) He claims his testimony would have presented a stronger case for self-defense as evidenced by Dr. Mahaffey's notes about her interview with him in which he gave his version of the incident in his native tongue (ECF No. 18-5). Rodriguez-Quezada acknowledges the claim is procedurally defaulted and alleges he can overcome the default under *Martinez*. (*Id.*) The Court has already determined it may not consider the notes taken during an interview with Dr. Mahaffey (ECF No. 18-5) because Rodriguez-Quezada must, but has

not, met the requirements of 28 U.S.C. § 2254(e)(2). Accordingly, the Court's ruling on Ground 2(A) is based on the evidence presented in the state court proceedings. Respondents contend Rodriguez-Quezada cannot overcome the default under *Martinez* because he knowingly, intentionally, and voluntarily, waived his right to testify. (ECF No. 40 at 16-17.)

A defendant in a criminal case has the right to take the witness stand and testify in his or her own defense. *See Rock v. Ark.*, 483 U.S. 44, 49 (1987) (noting that permitting a defendant to testify advances both the "detection of guilt" and "the protection of innocence") (internal quotation marks omitted) (quoting, in part, *Ferguson v. State of Ga.*, 365 U.S. 570, 581 (1961)); *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (explaining the Supreme Court recognizes "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal . . .") (internal citations omitted).

The record shows Rodriguez-Quezada was provided an interpreter throughout his trial. The State played Rodriguez-Quezada's video-taped interview with the detectives (Exhibits 757 and 760), and the parties each elicited testimony about that interview, played portions of the interview, and referred to it or played portions of it during closing remarks, and pointed out that Rodriguez-Quezada gave the interview without the benefit of an interpreter. (ECF No. 25-14; ECF No. 25-15; ECF No. 25-22 at 67-81, 100-02, 105-06, 113-14, 129-30.)[6] After the defense rested its case, the trial court canvassed Rodriguez-Quezada concerning his right to remain silent and not testify. (ECF No. 25-22 at 5-6.) Rodriguez-Quezada, using the services of an interpreter, stated he understood he had the right to testify, he had an opportunity to speak with his attorneys about the decision not to testify, and confirmed it was his decision not to testify in the trial. (*Id.*)

---

[6]Although the recording of that interview was admitted into evidence, the transcript was not admitted. (ECF No. 25-14 at 175).

Although this claim was not raised in the state proceedings, trial counsel testified at the state post-conviction evidentiary hearing that communication with Rodriguez-Quezada "required an interpreter." (ECF No. 26-32 at 13, 18-19.) Rodriguez-Quezada testified he told one of his trial counsels that he wished to testify at trial, and counsel told him, "No." (*Id.* at 27-28.) He also testified he told counsel he did not wish to testify at trial. (*Id.*) Trial counsel was not asked whether they advised Rodriguez-Quezada to testify.

Rodriguez-Quezada fails to raise a substantial claim of ineffective assistance of counsel for failing to advise him to testify at trial. Rodriguez-Quezada presents no evidence that either of his trial counsels advised him not to testify. Rodriguez-Quezada's self-serving statements given four years after his trial do not suffice because his statements are contradicted by his statements to the trial court that he made the decision not to testify after consulting with his attorneys. *See, e.g.*, *Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (denying ineffective-assistance-of-counsel claim where, aside from his self-serving statement, there was no evidence to support his claim that counsel neglected to discuss potential defenses that defendant could have raised at trial and the allegation contrary to his statement in the plea agreement that he discussed any possible defenses with his attorney).

Regardless of procedural default and the *Martinez* exception, Rodriguez-Quezada's *Strickland* claim cannot survive *de novo* review. *See* 28 U.S.C. § 2254(b)(2) (providing that a federal habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). Although Rodriguez-Quezada claims trial counsel's advice was deficient because Rodriguez-Quezada could have given a more credible explanation to support the self-defense theory had he been permitted to tell the story with the aid of an interpreter, the trial record shows trial counsel used the language barrier to support the self-defense theory. Counsel acknowledged to the jury that Rodriguez-Quezada's voluntary statement was given in broken English, was incomplete and inarticulate, and left gaps to fill in and

that Rodriguez-Quezada "doesn't know how to explain the law, to use those specific words. I was justified in my defense," and was "telling you in his own way as much of detail as he can." (ECF No. 49 at 18-19.) An objectively reasonable attorney could, as a matter of strategy, thus conclude that it was preferable to proceed without Rodriguez-Quezada's testimony in his native language because counsel could exploit to the defense's advantage the gaps in information contained in the interview with detectives without risk that cross-examination of Rodriguez-Quezada would undermine the self-defense theory. The ambiguity, his broken English and language barrier, his inarticulateness, and the incompleteness of his statement permitted counsel to argue the State did not prove a confession and, instead, argue the police failed to elicit an articulate statement of self-defense by highlighting those very deficiencies in the interview statement. (ECF No. 25-22 at 99-100.) Additionally, a reasonable defense attorney could thus conclude that presentation of a more articulate statement given at trial could undermine the self-defense theory by undermining Rodriguez-Quezada's credibility. Counsel could anticipate the jury could perceive any trial statement that differed from the statement given to the detectives as contrived to accommodate the State's evidence learned after the charges were filed. Thus, counsel could conclude a later statement, even if given in Rodriguez-Quezada's native tongue and even if it provided an articulate self-defense story, would nonetheless present the risk of undermining Rodriguez-Quezada's credibility and with that, the self-defense theory.

Therefore, Rodriguez-Quezada's claim that his trial counsel was deficient for failing to advise him to testify is not only insubstantial but would also fail on *de novo* review of the deficiency prong. *See Strickland*, 466 U.S. at 688. Accordingly, Ground 2(A) is dismissed as procedurally defaulted or, alternatively, denied on the merits.

### 4. Ground 2(B)—Failure to Present Evidence of Self-Defense

Rodriguez-Quezada alleges trial counsel provided ineffective assistance by failing to present evidence that Rodriguez-Quezada suffered a rib fracture because such

evidence would have supported the self-defense theory. (ECF No. 15 at 20-23.) As discussed, the Court may not consider Rodriguez-Quezada's jail medical evidence in its analysis of this claim because he failed to develop it as a part of the state court record and has not met the requirements of 28 U.S.C. § 2254(e)(2). Accordingly, the Court's analysis of the claim considers only the state court record.

At trial, defense counsel elicited that Rodriguez-Quezada was involved in an automobile accident in 2016 and that the detective did not locate medical records or information to determine how that might have affected his ability to protect himself from someone who was high on methamphetamine. (ECF No. 25-15 at 41.) And defense counsel elicited from the medical examiner that it takes "weeks to months" for a broken rib to heal and "months to even years to even go back to the original shape and contour of your rib." (ECF No. 25-11 at 195-96.) An objectively reasonable trial attorney could determine evidence of a rib fracture was unlikely to support the self-defense theory unless there was documentation that such an injury occurred because of the altercation with Edwards. Rodriguez-Quezada did not develop such evidence in the state court record. Accordingly, the claim of ineffective assistance of counsel wholly lacks merit. Because the claim is insubstantial, Ground 2(B) must be dismissed as procedurally defaulted.

### D. Ground 3—Cumulative Error

Rodriguez-Quezada alleges the cumulative effect of the errors in Grounds 1-2 violated his right to a fair trial and, even if considered individually, they were harmless, and if considered cumulatively, they violated his right to a fair trial. (ECF No. 15 at 23-25.) He concedes this claim is procedurally defaulted. (*Id.*) Respondents argued in their Motion to Dismiss the Petition that Rodriguez-Quezada never presented a cumulative error claim encompassing all the legal and factual allegations raised in his federal petition to the Nevada appellate courts. (ECF No. 29 at 5.) The Court concluded it would consider whether Ground 3 is procedurally defaulted after the parties completed briefing on the

merits because it was unclear whether there would be multiple claims of error before the Court to potentially cumulate. (ECF No. 33 at 5.)

"[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Chambers v. Miss.*, 410 U.S. 284, 290 & n.3 (1973); *see also Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("We have granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case."). A cumulative error claim may be exhausted to the extent that the underlying individual claims of error are exhausted. *See, e.g.*, *Cash v. Johnson*, No. 2:22-CV-01345-RFB-DJA, 2026 WL 867974, at *6 (D. Nev. Mar. 30, 2026).

"Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691-92. The Ninth Circuit Court of Appeals has held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (quoting, in part, *Strickland*, 466 U.S. at 690); *see also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of his claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)).

35

Rodriguez-Quezada has neither established cause and prejudice to overcome the procedural default of Ground 3 nor presented a basis to conclude that a miscarriage of justice will occur if the Court does not review his cumulative error claim. He has neither demonstrated constitutional error as to the *Allen/Wilkins* charge nor that trial counsel's performance was deficient. Accordingly, Ground 3 is dismissed as procedurally defaulted.

## IV. CERTIFICATE OF APPEALABILITY (COA)

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 580 U.S. 100, 115 (2017). Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. Therefore, the Court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner made "a substantial showing of the denial of a constitutional right." For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA issues only if reasonable jurists could debate whether (1) the petition states a valid claim of the denial of a constitutional right, and (2) the Court's procedural ruling was correct. *See id.* Applying these standards, a COA is warranted for Ground 1 of the Petition.

## V. CONCLUSION[7]

It is hereby ordered that the Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 15) is denied.

It is further ordered that Grounds 2 and 3 of the Petition are dismissed with prejudice as procedurally defaulted.

It is further ordered that all requests for an evidentiary hearing are denied.

---

[7]The Court notes the parties made arguments and cited cases not discussed

It is further ordered that a Certificate of Appealability is granted for Ground 1 and denied for all other grounds in the Petition.

It is further ordered that the Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 3rd Day of June 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

above. The Court reviewed these arguments and cases and determined they do not warrant discussion, as they do not affect the outcome of the issues before the Court.